Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

[additional counsel on signature page]

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

PATRICK VAN CAMP, derivatively on behalf of ADAMAS PHARMACEUTICALS, INC.,

      Plaintiff,

      v.

GREGORY T. WENT, ALFRED G. MERRIWEATHER, RICHARD A. KING, MICHAEL F. BIGHAM, MARTHA J. DEMSKI, MARDI C. DIER, WILLIAM W. ERICSON, IVAN LIEBERBURG, DAVID L. MAHONEY, and JOHN MACPHEE,

      Defendants,

      and

ADAMAS PHARMACEUTICALS, INC.,

      Nominal Defendant.

Case No.:

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Patrick Van Camp ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Adamas Pharmaceuticals, Inc. ("Adamas" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Gregory T. Went, Alfred G. Merriweather, Richard A. King, Michael F. Bigham, Martha J. Demski, Mardi C. Dier, William W. Ericson, Ivan Lieberburg, David L. Mahoney, and John MacPhee (collectively, the "Individual Defendants," and together with Adamas, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Adamas, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Adamas, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Adamas' directors and officers from August 8, 2017 through September 30, 2019 (the "Relevant Period").

2.     Adamas is a commercial pharmaceutical company based in Emeryville, California, that discovers, develops, and commercializes medication aimed at treating neurological diseases. The Company's flagship product is GOCOVRI (previously ADS-5102), an oral, extended-release formulation of amantadine, that was approved by the Food and Drug Administration ("FDA") in August 2017 for the treatment of levodopa-induced dyskinesia, commonly seen in patients with Parkinson's

disease. Amantadine is an antiviral medication, sold under different product brands, used to treat influenza and Parkinson's disease.

3.    As a commercial pharmaceutical company, an important measure of Adamas' profitability is the extent to which the Company's drugs are made accessible to patients through health insurers and other payors. Because health insurers bear at least part of the cost of the drugs and medications provided to the patients they insure, they have a strong incentive to make relatively cheap, generic drugs more widely available to insured individuals rather than more expensive, brand name drugs like GOCOVRI. Health insurers and other payors typically accomplish this by providing limited or no coverage for more expensive drugs where a generic alternative exists, or by requiring patients to obtain authorization from a physician or take other steps before paying for a more expensive drug.

4.    At the time that GOCOVRI became approved for marketing by the FDA, a generic drug approved to treat the same condition as GOCOVRI already existed on the market: immediate-release amantadine. As such, it should have been apparent to the Individual Defendants that health insurers and other payors would likely implement roadblocks to the widespread usage of GOCOVRI and; physicians would likely not prescribe GOCOVRI in place of generic amantadine unless GOCOVRI presented extremely significant clinical benefits beyond those presented by generic immediate-release amantadine. Indeed, not long after GOCOVRI entered the market, a number of large healthcare management companies issued coverage guidelines imposing onerous requirements on patients seeking to use GOCOVRI, such as requiring patients to try generic amantadine first, or to obtain prior approval from a doctor.

5.    Nonetheless, the Individual Defendants personally made certain false and misleading statements and/or allowed certain of the Individual Defendants and the Company to make numerous statements in press releases and conference calls from the beginning of the Relevant Period until November 1, 2018, at least, assuring the investing public that GOCOVRI would not face significant impediments to its use, and that the impact of any impediments that payors did implement, such as limiting coverage of the drug or making its use contingent on patients meeting certain requirements, would be minimal. Throughout its commercial launch, the Company touted strong predictions for

GOCOVRI's market performance as a purportedly unique therapy that would and did obtain strong and solid support from physicians as well as insurers.

6. The truth emerged gradually over the course of several months, beginning on October 5, 2018, when a Bank of America/Merrill Lynch analyst issued a report indicating that patients had been dropping out of GOCOVRI treatment at higher-than-expected rates, due to the cost and difficulties imposed by payors.

7. On this news, the Company's stock price fell approximately 8%, from $19.35 per share at close on October 4, 2018, to $17.83 per share at close on October 5, 2018.

8. Soon after, the Company disclosed disappointing prescription rates for GOCOVRI in its quarterly earnings results issued on November 1, 2018, prompting a steep drop in the Company's stock price of nearly 30%, from $16.97 per share at close on November 1, 2018, to $11.89 per share at close on November 2, 2018. A similar debacle occurred in the wake of a conference call held on March 4, 2019, when certain of the Individual Defendants revealed that GOCOVRI prescriptions would continue to slow down, and refused to give any further insight as to GOCOVRI's ability to attain a sizable market share. On this news, the price of the Company's stock dropped by over 32%, from $12.15 per share at close on March 4, 2019, to $8.16 per share at close on March 5, 2019. These disclosures were followed by a slew of negative reports from analysts, many of whom downgraded their ratings of the Company's stock.

9. Finally, after analysts at the Evaluate Group and Bank of America/Merrill Lynch published grim reports on GOCOVRI's prospects on September 27, 2019 and September 30, 2019, respectively, the price of the Company's stock underwent a precipitous six-day decline, from $7.05 per share at close on September 26, 2019, to $4.03 at close on October 3, 2019, a drop of over 42%.

10. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or allowed certain of the Individual Defendants to make false and misleading statements to the investing public that failed to

disclose, *inter alia*, that: (1) health insurers and other payors were by and large providing limited or no coverage of GOCOVRI, or were imposing burdensome requirements that limited patients' access to GOCOVRI; (2) as payors began to indicate their positions on GOCOVRI, the number of physicians prescribing GOCOVRI would decrease precipitously; (3) as a result of the foregoing, GOCOVRI's sales, market penetration, and market share would be severely impacted in the long run; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public, while three of the Individual Defendants engaged in improper insider sales, netting proceeds of approximately $280,869.

12.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

13.     In light of the Individual Defendants' misconduct, which has subjected Adamas, its former Chief Executive Officer ("CEO"), and its former Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the former CEO's and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority

of Adamas' Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

20.     Venue is proper in this District because Adamas and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of Adamas common stock. Plaintiff has continuously held Adamas common stock at all relevant times.

**Nominal Defendant Adamas**

22.      Adamas is a Delaware corporation with its principal executive offices at 1900 Powell Street, Suite 1000, Emeryville, California 94608. Adamas' shares trade on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "ADMS."

**Defendant Went**

23.      Defendant Gregory T. Went ("Went") served as the Company's CEO and Chairman from the founding of the Company in 2000 until he resigned on September 11, 2019. According to the Company's Schedule 14A filed with the SEC on April 25, 2019 (the "2019 Proxy Statement"), as of February 15, 2019, Defendant Went beneficially owned 1,497,198 shares of the Company's common stock, which represented 5.2% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's stock at the close of trading on February 15, 2019 was $10.53, Defendant Went owned approximately $15.7 million worth of Adamas stock.

24.      For the fiscal year ended December 31, 2018, Defendant Went received $3,359,123 in compensation from the Company. This included $550,000 in salary, $260,200 in bonuses, $529,238 in stock awards, $2,013,363 in option awards, and $6,322 in all other compensation.

25.      During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Went made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| March 21, 2018 | 4,541 | $25.75 | $116,930 |
| December 14, 2017 | 6,319 | $7.99 | $50,488 |

Thus, in total, before the fraud was exposed, he sold 10,860 Company shares on inside information, for which he received approximately $167,418. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

26.      The Company's 2019 Proxy Statement stated the following about Defendant Went:

Dr. Went, age 55, has served as our Chief Executive Officer and Chairman of our Board of Directors since our inception in 2000. Previously, Dr. Went co-founded CuraGen Corporation in 1992, where he served as an Executive Vice President and director from 1996 to 1999. Dr. Went also has served as a director of Angelica Therapeutics, Inc., a biotechnology company, since 2006. Dr. Went holds a Ph.D. in Chemical Engineering from the University of California, Berkeley and a B.S. in Chemical Engineering from Carnegie Mellon University. We believe Dr. Went's extensive knowledge of our company, the pharmaceutical industry, and our competitors qualifies him to serve on our Board of Directors.

**Defendant Merriweather**

27.     Defendant Alfred G. Merriweather ("Merriweather") served as the Company's CFO from June 2017 until he retired on November 1, 2019. According to the 2019 Proxy Statement, as of February 15, 2019, Defendant Merriweather beneficially owned 67,942 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on February 15, 2019 was $10.53, Defendant Merriweather owned approximately $715,429 worth of Adamas stock.

28.     For the fiscal year ended December 31, 2018, Defendant Merriweather received $1,637,050 in compensation from the Company. This included $420,000 in salary, $180,600 in bonuses, $214,903 in stock awards, $817,547 in option awards, and $4,000 in all other compensation.

29.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Merriweather made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| September 21, 2018 | 1,665 | $19.18 | $31,934 |
| March 20, 2019 | 857 | $7.99 | $6,894 |
| September 20, 2019 | 1,584 | $6.91 | $10,945 |

Thus, in total, before the fraud was exposed, he sold 4,106 Company shares on inside information, for which he received approximately $49,726. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

30.     The Company's 2019 Proxy Statement stated the following about Defendant Merriweather:

Mr. Merriweather joined as our Chief Financial Officer in June 2017. Mr. Merriweather has held executive leadership roles at numerous companies in the life sciences industry throughout his career. Before coming to Adamas, he was Chief Financial Officer at RainDance Technologies, Inc., a life science tools company, from November 2013 to February 2017, where he was responsible for the finance, information technology, human resources and general legal functions. Prior to RainDance, he served as Chief Financial Officer of Verinata Health, Inc., a prenatal laboratory testing company, from January 2012 to July 2013, where he was responsible for the finance and general legal functions, and as Senior Vice President and Chief Financial Officer of Celera Corporation, a diagnostic products and laboratory testing company, from December 2010 until May 2011, where he was responsible for the finance and information technology functions. Mr. Merriweather has spent over 25 years in senior financial positions at several private and public life science companies, including Monogram Biosciences, Inc. and Laserscope. Mr. Merriweather received a Bachelor's degree from the University of Cambridge in the United Kingdom.

**Defendant King**

31.     Defendant Richard A. King ("King") served as the Company's Chief Operating Officer ("COO") from April 28, 2017 until he resigned on September 15, 2018. According to the 2019 Proxy Statement, as of February 15, 2019, Defendant King beneficially owned 81,260 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on February 15, 2019 was $10.53, Defendant King owned approximately $855,667 worth of Adamas stock.

32.     For the fiscal year ended December 31, 2018, Defendant King received $2,372,524 in compensation from the Company. This included $346,233 in salary, $138,203 in bonuses, $282,260 in stock awards, $1,073,794 in option awards, and $532,034 in all other compensation.

33.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant King made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| June 21, 2018 | 2,501 | $25.48 | $63,725 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

8

34.     The Company's Schedule 14A filed on April 26, 2018 (the "2018 Proxy Statement") stated the following about Defendant King:

> Richard A. King. Mr. King joined as our Chief Operating Officer in April 2017. Mr. King has held executive leadership roles at numerous companies in the life sciences industry throughout his career. Most recently, from May 2016 to April 2017, Mr. King was Chief Operating Officer at The Scripps Research Institute, where he was responsible for strategic planning, business development, finance, human resources, facilities, information technology and research services. He previously served as President and Chief Executive Officer of AcelRx Pharmaceuticals, Inc., a specialty pharmaceutical company developing new pain medications, from May 2010 to March 2015, where he was responsible for overseeing all aspects of AcelRx's business. Prior to AcelRx, he was President, Chief Operating Officer and General Manager of the biotechnology company Tercica, Inc. (later sold to the Ipsen Group), where he was instrumental in the commercial launch of Dysport® (abobotulinumtoxinA) and Increlex™ (rhIGF-1). He also previously served as Executive Vice President of commercial operations at Kos Pharmaceuticals, Inc., where he oversaw the growth of Niaspan® (niacin extended-release) and the launch of Advicor® (niacin extended-release/lovastatin). He was Senior Vice President of commercial operations at Solvay and Vice President of commercial operations at Unimed, where he launched AndroGel® (testosterone gel). Earlier in his career, he held positions of increasing responsibility at SmithKline Beecham and Lederle Laboratories. Mr. King received a B.Sc. in chemical engineering from the University of Surrey in the U.K. and an M.B.A. from the Manchester Business School in the U.K.

**Defendant Bigham**

35.     Defendant Michael F. Bigham ("Bigham") has served as a Company director since September 2006. He also serves as a member of the Company's Audit Committee and Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of February 15, 2019, Defendant Bigham beneficially owned 35,000 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on February 15, 2019 was $10.53, Defendant Bigham owned approximately $368,550 worth of Adamas stock.

36.     For the fiscal year ended December 31, 2018, Defendant Bigham received $220,985 in compensation from the Company. This included $52,750 in fees earned or paid in cash and $168,235 in option awards.

37.     The Company's 2019 Proxy Statement stated the following about Defendant Bigham:

> Mr. Bigham, age 61, has served as a member of our Board of Directors since September 2016. Mr. Bigham was appointed Chief Executive Officer and Chairman of the board of

directors of Paratek Pharmaceuticals, Inc. in October 2014. Mr. Bigham has more than 25 years of senior leadership experience in the biopharmaceutical industry. From 2003 to 2013, he was a General Partner at Abingworth LLP, a leading international investment group dedicated to life sciences and healthcare. From 2014 to 2018, he served as an Executive Partner at Abingworth LLP. He currently serves on the boards of Paratek Pharmaceuticals and Adamas Pharmaceuticals, and in the past has held several directorships, including at Avila Therapeutics (where he was also the founding Chairman and CEO), Magellan Biosciences, Portola Pharmaceuticals, Supernus Pharmaceuticals, Inmediata (Chairman) and Valeritas. Mr. Bigham was formerly Vice Chairman of Corixa Corporation, a publicly-traded biotechnology company, and was President and Chief Executive of Coulter Pharmaceuticals, a publicly-traded oncology company, until it merged into Corixa. Previously, he was an early employee at Gilead Sciences where he served in various capacities, including Executive Vice President of Operations and Chief Financial Officer. Before joining Gilead, Mr. Bigham was a Partner at Hambrecht & Quist where he became Co-Head of Healthcare Investment Banking. Mr. Bigham received his B.S. from the University of Virginia and qualified as a C.P.A. before completing his M.B.A. at Stanford University. We believe Mr. Bigham's extensive experience on the boards of and in management positions with biopharmaceutical companies, including publicly-traded companies, qualifies him to serve on our Board of Directors.

**Defendant Demski**

38.     Defendant Martha J. Demski ("Demski") has served as a Company director since March 2014. She also serves as the Chair of the Company's Audit Committee, and as a member of the Compensation Committee. According to the 2019 Proxy Statement, as of February 15, 2019, Defendant Demski beneficially owned 78,000 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on February 15, 2019 was $10.53, Defendant Demski owned approximately $821,340 worth of Adamas stock.

39.     For the fiscal year ended December 31, 2018, Defendant Demski received $232,235 in compensation from the Company. This included $64,000 in fees earned or paid in cash and $168,235 in option awards.

40.     The Company's 2019 Proxy Statement stated the following about Defendant Demski:

Ms. Demski, age 66, has served as a member of our Board of Directors since March 2014. From August 2011 to May 2017, Ms. Demski served as Senior Vice President and Chief Financial Officer of Ajinomoto Althea, Inc. (formerly Althea Technologies, Inc.), a fully-integrated contract development and manufacturing organization. From July 2008 to December 2010, Ms. Demski served as the Interim Chief Operating Officer and Chief Financial Officer of the Sidney Kimmel Cancer Center (SKCC), a non-profit corporation that was engaged in biomedical research prior to voluntarily filing for Chapter 11

bankruptcy in 2009. Previously, Ms. Demski served as Vice President and Chief Financial Officer of Vical Incorporated, a publicly traded biotech company from December 1988 to June 2004. Ms. Demski currently serves as Chair of the board of directors of Chimerix, Inc., a publicly traded biotech company. Ms. Demski also serves as a member of the board of directors of Equillium, Inc., a publicly traded biotech company where she serves as chair of the audit committee and a member of the compensation committee. Ms. Demski is a National Association of Corporate Directors Board Governance Fellow and received the Director of the Year in Corporate Governance from the Corporate Directors Forum in 2017. Additionally, Ms. Demski has over 13 years of banking experience with Bank of America. Ms. Demski earned a B.A. from Michigan State University and M.B.A. from The University of Chicago Booth School of Business with concentrations in accounting and finance. We believe Ms. Demski's more than 30 years' experience in the fields of finance and biotechnology, as well as her experience as a chief financial officer of a publicly traded company and her experience in conducting financing transactions qualifies her to serve on our Board of Directors.

**Defendant Dier**

41.     Defendant Mardi C. Dier ("Dier") has served as a Company director since October 2017. She also serves as a member of the Company's Audit Committee. According to the 2019 Proxy Statement, as of February 15, 2019, Defendant Dier beneficially owned 10,000 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on February 15, 2019 was $10.53, Defendant Dier owned approximately $105,300 worth of Adamas stock.

42.     For the fiscal year ended December 31, 2018, Defendant Dier received $216,360 in compensation from the Company. This included $48,125 in fees earned or paid in cash and $168,235 in option awards.

43.     The Company's 2019 Proxy Statement stated the following about Defendant Dier:

Ms. Dier, age 55, has served as a member of our Board of Directors since October 2017. Ms. Dier has served as Executive Vice President and Chief Financial Officer of Portola Pharmaceuticals since November 2013 after joining the company in August 2006. At Portola, Ms. Dier has overseen the development of the accounting, finance, global supply chain, investor relations, communications, IT and facilities functions, and has led the raising of over $1.25 billion in capital. Previously, she served as Vice President of Investor Relations at Chiron Corporation from 2003 until its acquisition by Novartis Pharmaceuticals in April 2006. Prior to joining Chiron, she served as a Director in the West Coast investment banking practice at Prudential Securities, where she focused on biotechnology and other life sciences companies. Ms. Dier was previously at KPMG LLP in the audit department. She holds a B.S. in biology from Stanford University and an M.B.A. from The Anderson School at the University of California, Los Angeles. In 2013, Ms. Dier was recognized as one of the most influential Bay Area business women by the

San Francisco Business Times and was a finalist for its Bay Area CFO of the Year Award. We believe Ms. Dier's more than 25 years' financial management experience in the biotechnology industry, as well as her experience as a chief financial officer of a publicly traded company, qualifies her to serve on our Board of Directors.

**Defendant Ericson**

44.     Defendant William W. Ericson ("Ericson") has served as a Company director since 2005. He also serves as the Chair of the Company's Nominating and Corporate Governance Committee, and as a member of the Compensation Committee. According to the 2019 Proxy Statement, as of February 15, 2019, Defendant Ericson beneficially owned 4,698,796 shares of the Company's common stock, which represented 17.1% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's stock at the close of trading on February 15, 2019 was $10.53, Defendant Ericson owned approximately $49.4 million worth of Adamas stock.

45.     For the fiscal year ended December 31, 2018, Defendant Ericson received $222,735 in compensation from the Company. This included $54,500 in fees earned or paid in cash and $168,235 in option awards.

46.     The Company's 2019 Proxy Statement stated the following about Defendant Ericson:

Mr. Ericson, age 60, has served as a member of our Board of Directors since 2005. Mr. Ericson has been a General Partner at Mohr Davidow Ventures, or MDV, a venture capital firm, since 2000, and has served as Managing Partner since 2008. Prior to joining MDV, Mr. Ericson founded and operated Venture Law Group LLP's Seattle office from 1996 to 2000. Mr. Ericson currently serves as a member of the board of directors of Pacific Biosciences of California, Inc., a publicly traded gene sequencing company, Rocket Fuel Inc., a publicly traded digital advertising company, Northwestern University School of Law, and a number of MDV's privately held portfolio companies. Mr. Ericson holds a B.S.F.S. from the School of Foreign Service at Georgetown University and a J.D. from Northwestern University School of Law. We believe Mr. Ericson's extensive experience in finance and service as a board member of public companies in the technology and life sciences industries and his training as a securities lawyer qualifies him to serve on our Board of Directors.

**Defendant Lieberburg**

47.     Defendant Ivan Lieberburg ("Lieberburg") has served as a Company director since 2004. According to the 2019 Proxy Statement, as of February 15, 2019, Defendant Lieberburg beneficially owned 191,000 shares of the Company's common stock. Given that the price per share of the

Company's stock at the close of trading on February 15, 2019 was $10.53, Defendant Lieberburg owned approximately $2.01 million worth of Adamas stock.

48.     For the fiscal year ended December 31, 2018, Defendant Lieberburg received $206,985 in compensation from the Company. This included $38,750 in fees earned or paid in cash and $168,235 in option awards.

49.     The Company's 2019 Proxy Statement stated the following about Defendant Lieberburg:

Dr. Lieberburg, age 69, has served as a member of our Board of Directors since 2004. Dr. Lieberburg has been a member of the Tavistock Group, a private equity firm, since 2009, and a managing director of Boxer Capital, since 2017, where he concentrates on health care and life sciences investment opportunities. From 1987 to 2009, Dr. Lieberburg was employed by Elan Pharmaceuticals, Inc. (formerly Athena Neurosciences, Inc.), where his most recent roles were as Executive Vice President, Corporate Office of Technology and Chief Medical Officer. Dr. Lieberburg holds an A.B. in Biology from Cornell University, a Ph.D. in Neurobiology from The Rockefeller University, and an M.D. from the University of Miami Leonard M. Miller School of Medicine. Dr. Lieberburg is board certified in internal medicine and endocrinology/metabolism. We believe Dr. Lieberburg's executive experience in the life sciences industry and his medical training qualifies him to serve on our Board of Directors.

**Defendant Mahoney**

50.     Defendant David L. Mahoney ("Mahoney") has served as a Company director since 2009, and as the Chairman of the Board since September 11, 2019. He also serves as the Chair of the Company's Compensation Committee. According to the 2019 Proxy Statement, as of February 15, 2019, Defendant Mahoney beneficially owned 196,781 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on February 15, 2019 was $10.53, Defendant Mahoney owned approximately $2.07 million worth of Adamas stock.

51.     For the fiscal year ended December 31, 2018, Defendant Mahoney received $240,610 in compensation from the Company. This included $72,375 in fees earned or paid in cash and $168,235 in option awards.

52.     The Company's 2019 Proxy Statement stated the following about Defendant Mahoney:

Mr. Mahoney, age 64, has served as a member of our Board of Directors since 2009, and is currently the Lead Independent Director and chair of the Compensation Committee. Mr. Mahoney has served on the board of directors of Symantec Corporation, a publicly-

traded software technology company since 2003, including as current chair of the Compensation and as former chair of the Nominating and Governance Committees. Mr. Mahoney also served as a member of the Audit Committee of Symantec from 2003 to 2011. Mr. Mahoney has served on the board of directors of Corcept Therapeutics Incorporated, a pharmaceutical company since 2004, including as a member of the Audit and as a chair of the Nominating and Governance Committees. He also serves on the boards of directors of San Francisco Museum of Modern Art, Mount Holyoke College and Mercy Corps, and is a Trustee of the Schwab/Laudus Family of Funds. From 1999 to 2001, Mr. Mahoney served as co-CEO of McKesson HBOC, Inc., a healthcare supply management and information technology company and as CEO of McKesson LLC, a healthcare management and connectivity company. He joined McKesson Corporation in 1990 as Vice President for Strategic Planning. Prior to joining McKesson, Mr. Mahoney was a principal with McKinsey & Company, a management consulting firm, where he worked from 1981 to 1990. Mr. Mahoney holds a B.A. from Princeton University and an M.B.A. from Harvard University. We believe Mr. Mahoney's extensive experience in pharmaceutical distribution, fiscal management, and in operating and advising technology companies qualifies him to serve on our Board of Directors.

**Defendant MacPhee**

53.    Defendant John MacPhee ("MacPhee") has served as a Company director since May 2013. According to the 2019 Proxy Statement, as of February 15, 2019, Defendant MacPhee beneficially owned 279,600 shares of the Company's common stock, which represented 1% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's stock at the close of trading on February 15, 2019 was $10.53, Defendant MacPhee owned approximately $2.94 million worth of Adamas stock.

54.    For the fiscal year ended December 31, 2018, Defendant MacPhee received $206,985 in compensation from the Company. This included $38,750 in fees earned or paid in cash and $168,235 in option awards.

55.    The Company's 2019 Proxy Statement stated the following about Defendant MacPhee:

Mr. MacPhee, age 51, has served as a member of our Board of Directors since May 2013 and provided consulting services to us from March 2011 to May 2013, and from February 2016 to December 2016. Since 2011, Mr. MacPhee has served as the Executive Director and CEO of The Jed Foundation, a non-profit organization. From 2005 to 2011, Mr. MacPhee served as Executive Vice President of Par Pharmaceutical, Inc. and President of Par's Strativa Pharmaceuticals division, where he oversaw commercial operations, clinical development, medical affairs, alliance management, and business development. Previously, Mr. MacPhee worked at Forest Laboratories, Inc., where he led the launches of Celexa, Lexapro, and Namenda. Mr. MacPhee also serves as a board member for Blackthorn Therapeutics, a privately-held pharmaceutical company.

Mr. MacPhee holds a B.A. from Columbia College, an M.B.A. from New York University, and an M.P.H. from Columbia University. We believe Mr. MacPhee's extensive experience building successful specialty pharmaceutical companies and commercializing drug products qualifies him to serve on our Board of Directors.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

56.     By reason of their positions as officers, directors, and/or fiduciaries of Adamas and because of their ability to control the business and corporate affairs of Adamas, the Individual Defendants owed Adamas and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Adamas in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Adamas and its shareholders so as to benefit all shareholders equally.

57.     Each director and officer of the Company owes to Adamas and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

58.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Adamas, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

59.     To discharge their duties, the officers and directors of Adamas were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

60.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Adamas, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants

who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Adamas' Board at all relevant times.

61.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

62.     To discharge their duties, the officers and directors of Adamas were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Adamas were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Adamas' own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Adamas conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Adamas and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Adamas' operations would comply with all applicable laws and Adamas' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

63.     Each of the Individual Defendants further owed to Adamas and the shareholders the duty of loyalty requiring that each favor Adamas' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

64.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Adamas and were at all times acting within the course and scope of such agency.

65.     Because of their advisory, executive, managerial, and directorial positions with Adamas, each of the Individual Defendants had access to adverse, non-public information about the Company.

66.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Adamas.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

67.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

68.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

69.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Adamas, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

70.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

71.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Adamas and was at all times acting within the course and scope of such agency.

## **ADAMAS' CODE OF CONDUCT**

72.     Adamas' Code of Conduct states, "[w]e expect every employee, officer and director to read and understand the Code and its application to the performance of his or her business responsibilities. References in the Code to employees are intended to cover officers and, as applicable, directors."

73.     In a section titled, "Honest and Ethical Conduct," the Code of Conduct states the following:

> It is the policy of the Company to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

74.     In a section titled, "Legal Compliance," the Code of Conduct states the following:

> Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail in Section 3 below). While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor, the Legal and Healthcare Compliance Department, or the Chief Compliance Officer (CCO). The Board has appointed the General Counsel as Compliance Officer, who is responsible for administering this Code. Our Compliance Officer may be reached for purposes of this policy by email at compliance@adamaspharma.com.

> Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

75.     In a section titled, "Insider Trading," the Code of Conduct states the following:

Employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about the Company or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees must exercise the utmost care when handling material inside information. Please refer to the Company's Insider Trading, Window, and Pre-Clearance Policy for more detailed information.

76.     In a section titled, "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting," the Code of Conduct states the following:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- employees comply with our system of internal controls; and

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

77.     The Code of Conduct's "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting" section further states the following:

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely

upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our Finance and Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the CCO, the Audit Committee of the Board or one of the other Corporate Compliance resources described in Section 16 or in accordance with the provisions of the Company's Whistleblower Policy on reporting complaints regarding accounting and auditing matters.

78.    In a section titled, "Fair Dealing," the Code of Conduct states the following:

We strive to outperform our competition fairly and honestly. Advantages over our competitors are to be obtained through superior performance of our products and services, not through unethical or illegal business practices. Acquiring proprietary information from others through improper means, possessing trade secret information that was improperly obtained, or inducing improper disclosure of confidential information from past or present employees of other companies is prohibited, even if motivated by an intention to advance our interests. If information is obtained by mistake that may constitute a trade secret or other confidential information of another business, or if you have any questions about the legality of proposed information gathering, you must consult your supervisor or the CCO, as further described in Section 16.

You are expected to deal fairly with our customers, suppliers, employees and anyone else with whom you have contact in the course of performing your job. Be aware that the Federal Trade Commission Act provides that "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." It is a violation of the Act to engage in deceptive, unfair or unethical practices and to make misrepresentations in connection with sales activities.

Employees involved in procurement have a special responsibility to adhere to principles of fair competition in the purchase of products and services by selecting suppliers based exclusively on normal commercial considerations, such as quality, cost, availability, service and reputation, and not on the receipt of special favors.

79.     In a section titled, "Protection and Proper Use of Company Assets," the Code of Conduct states the following, in relevant part:

All employees are expected to protect our assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on our profitability. Our property, such as office supplies, computer equipment, and buildings, are expected to be used only for legitimate business purposes, although incidental personal use may be permitted. You may not, however, use our corporate name, any brand name or trademark owned or associated with the Company or any letterhead stationery for any personal purpose.

80.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, and failing to report the same. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

81.     Adamas is a pharmaceutical company specializing in developing treatments for a range of central nervous system disorders, including Alzheimer's disease and Parkinson's disease.

82.     The Company's flagship product is GOCOVRI, an extended-release formulation of the drug amantadine, previously known as ADS-5102. GOCOVRI was approved by the FDA on August 24,

2017, and is "indicated," or approved for use, for the treatment of Parkinson's disease. Specifically, GOCOVRI treats dyskinesia, or involuntary muscle spasms, in patients undergoing levodopa therapy, which replaces dopamine lost due to the progression of Parkinson's disease.

83.     In order to successfully market and sell their products, pharmaceutical companies, such as Adamas, have to contend with health insurers and other payors, who seek to minimize their spending by employing a variety of cost containment strategies. The main strategy payors use to reduce costs is to price pharmaceutical drugs by tier. Typically, a payor accomplishes this by providing different co-pay amounts for drugs in their formulary, the list of all drugs that a payor offers coverage for. A typical tiered copay system can consist of around five tiers, with generic drugs priced at $1 to $3 at the lowest tier, and newer, brand name drugs priced at $150 or more at the higher tiers. Some payors may exclude highly priced, brand name drugs from their formularies altogether, so long as generic alternatives exist.

84.     Two other significant cost containment strategies for payors are "prior authorization" and "step therapy." If a payor requires prior authorization for a specific drug, the payor will not provide coverage for the drug unless a doctor requests approval to prescribe that drug to a given patient. Such a request may include a description of the patient's specific circumstances and why the drug is medically necessary for that patient. Step therapy is a stricter form of prior authorization that requires patients to begin treatment with relatively cheap, cost-effective drugs, and to progress to the use of more expensive or risky drugs only if medically necessary.

85.     Shortly after GOCOVRI received FDA approval in 2017, payors began limiting their coverage of GOCOVRI, and requiring patients seeking to use the drug to obtain prior authorization or go through step therapy before receiving GOCOVRI.

86.     For instance, on October 10, 2017, Centene Corporation, a health management company, issued coverage guidelines requiring patients seeking to use GOCOVRI to first take immediate-release amantadine, an inexpensive generic alternative to GOCOVRI. Centene Corporation's guidelines stated that it would cover treatment with GOCOVRI only if generic amantadine failed to resolve a patient's symptoms, or the patient suffered a significant adverse reaction to generic amantadine.

87.     In January 2018, Prime Therapeutics, a large pharmaceutical benefits management company associated with BlueCross BlueShield, and covering over 28 million patients, issued coverage guidelines requiring doctors to obtain prior authorization before prescribing GOCOVRI, and requiring patients to use generic amantadine before progressing to GOCOVRI.

88.     In March 2018, Kaiser Permanente, another large healthcare management company providing coverage to over 12 million patients, issued coverage guidelines that also required generic amantadine step therapy before patients could progress to GOCOVRI.

89.     Despite these developments, throughout the Relevant Period, the Individual Defendants repeatedly represented to the public that GOCOVRI would not be excluded from payors' formularies, and that patients seeking to use the drug would not be subjected to the additional hurdles of prior authorization and step therapy.

**False and Misleading Statements**

***August 8, 2017 Press Release and Conference Call***

90.     On August 8, 2017, The Company issued a press release announcing the Company's financial results for the fiscal quarter ended June 30, 2017. The press release stated, in relevant part:

"This is a very exciting time for Adamas, as ***we are potentially at the cusp of transitioning from a company focused on product development to a commercial entity marketing its own medicines***," stated Gregory T. Went, Ph.D., Chairman and Chief Executive Officer of Adamas Pharmaceuticals, Inc. "We look forward to hearing from the FDA regarding the potential approval of ADS-5102 for the treatment of levodopa-induced dyskinesia in people with Parkinson's disease. If approved, ***ADS-5102 will be the first and only approved medicine for this indication***." The New Drug Application for ADS-5102 has a PDUFA date of August 24, 2017.

Recent Achievements

- Presented expanded analysis from the ADS-5102 (amantadine extended release capsules) open-label study at the 21st International Congress of Parkinson's Disease and Movement Disorders (MDS) meeting showing tolerability and durability out to 88 weeks. The new subgroup analyses also showed that ***patients previously treated with immediate-release amantadine, who switched directly to ADS-5102, experienced a statistically significant benefit from ADS-5102 comparable to patients not previously treated with ADS-5102.***
- Published ADS-5102 Phase 3 EASE LID clinical trial data in JAMA Neurology online. ***The data demonstrated that ADS-5102 significantly reduced both***

*dyskinesia and OFF time at six months in Parkinson's disease patients with levodopa-induced dyskinesia.*

(Emphasis added.)

91.    Later that same day, on August 8, 2017, the Company held a conference call to discuss the Company's financial results for the fiscal quarter ended June 30, 2017. During the call, Defendant Went stated, "This is a pivotal time here at Adamas, as we are at the cusp of transitioning to a commercial entity that delivers its medicines to people in need."

92.    Also during the call, the following exchange took place between Piper Jaffray analyst David Amsellem and Defendant King:

[Amsellem:] And my question here is what are your thoughts on the extent to which payers are going to force patients to step through immediate-release amantadine in order to get access to 5102? Is that something that you're planning for?

* * *

[King:] We've obviously done a fair amount of assessment of ADS-5102 with physicians and with payers. The profile for the product, as I mentioned in the comments, resonates extremely well. And they don't see this profile as really having much to do with the amantadine IR profile that they – that's currently on the marketplace. ***They recognize that amantadine IR is not approved for this indication. And that if ADS-5102 is approved for this indication and with the clinical dataset that is available to support it, that there's no anticipation of requiring a step-through of amantadine IR to get to 5102***.

(Emphasis added.)

***November 2, 2017 Press Release and Conference Call***

93.    On November 2, 2017, The Company issued a press release announcing the Company's financial results for the fiscal quarter ended September 30, 2017. The press release stated the following, in relevant part:

Recent Achievements

GOCOVRI™

- ***Received approval by the U.S. Food and Drug Administration (FDA) for GOCOVRI (amantadine) extended release capsules (previously ADS-5102) for treatment of dyskinesia in patients with Parkinson's disease receiving levodopa-based therapy, with or without concomitant dopaminergic medications, on August 24, 2017. GOCOVRI is the first and only medicine approved by the FDA for this indication.***

- Earned seven-years of orphan drug exclusivity from the FDA for GOCOVRI, which will continue through August 24, 2024.
- Provided access to GOCOVRI for physicians and patients through its distribution network and GOCOVRI Onboard, Adamas' patient services support program.
- Hired six regional sales leaders to manage its planned 59 neurology account specialist sales force.
- Published GOCOVRI (ADS-5102) Phase 3 EASE LID 2 open-label clinical trial data in the *Journal of Parkinson's Disease*. The data demonstrated tolerability and durability out to 88 weeks and a subgroup analysis showed that patients previously having undergone Deep Brain Stimulation also received benefit from ADS-5102.
- Published GOCOVRI (ADS-5102) Phase 3 EASE LID 3 clinical trial data in *Movement Disorders*. The data demonstrated that ADS-5102 significantly reduced both dyskinesia and OFF time at three months in Parkinson's disease patients with dyskinesia on levodopa-based therapy and confirmed the results from the EASE LID study, as published in *JAMA Neurology,* which showed the significant reduction in dyskinesia and OFF time for 6 months.

(Emphasis added.)

94.     Later that same day, on November 2, 2017, the Company held a conference call to discuss the Company's financial results for the fiscal quarter ended September 30, 2017. During the call, Defendant Went stated, "With the upcoming commercial launch of GOCOVRI, we are fulfilling our corporate strategy of building a multi-product company that discovers, develops and commercialize[s] medicines to treat chronic neurologic disorders."

95.     Also during the call, Defendant King stated the following regarding doctors' and insurers' interest in GOCOVRI:

> Reacting to this product profile presented in market research, *physicians reported they would use GOCOVRI and [sic] a little over half of their dyskinesia patients. They specify that they would use it in place of all three of the satisfactory dyskinesia management strategies that they currently use, as well as in patients who are currently not being treated at all for the dyskinesia*.
>
> * * *
>
> We have also begun outreach to payers and have scheduled clinical presentation with seven out of the top 10 payers in the country for later this year. The payers are particularly interest[ed] in GOCOVRI as a first indication medicine for dyskinesia patients who they recognize are in need. *We anticipate broad payer coverage for GOCOVRI. And will grow over the cost* [sic] *of 2018*.

(Emphasis added.)

*February 22, 2018 Conference Call*

96.     On February 22, 2018, the Company held a conference call to discuss the Company's financial results for the fiscal quarter and full year ended December 31, 2017. During the call, Defendant King stated the following:

> As you know, our discussions with payers regarding GOCOVRI are in full swing. ***Clinical presentations have been well received, and these payers are moving forward in their process to determine guidelines for reimbursement. It is important to note that even in situations in which payers have not published reimbursement criteria, we are routinely seeing patients receive reimbursement for GOCOVRI.*** We continue to engage payers to streamline the processing of claims for GOCOVRI.
>
>                                        * * *
>
> GOCOVRI Onboard is working well to process receipt prescriptions, with the majority of patients in both commercial and Medicare coverage gaining access to GOCOVRI. ***We are not providing drug samples, and we do not have a free trial program through our specialty pharmacy. We do have a QuickStart Program, whereby qualified patients can receive a free 14-day supply if the benefits verification process is taking more than five days. To date, a majority of patients have not utilized this program.***

(Emphasis added.)

97.     In response to an analyst's question about whether the reimbursement process for GOCOVRI was "going relatively smooth[ly]" for patients, Defendant Merriweather stated the following:

> ***It is, because it's going relatively smoothly, and we're getting to a point where we get reimbursement before we need to move towards a QuickStart***. I'm not sure I can give you any more characteristic than that other than, there's no - I can't say, they're all commercial. They're all Medicare. We're seeing across all different characteristics of the payer environment, and there's no particular patient environment that I can point you even at this stage.

(Emphasis added.)

98.     Also during the call, the following exchange took place between Cowen analyst Ken Cacciatore and Defendant Went:

> [Cacciatore:] So can you give us a sense, again, on some of these plans, whether there's been prior authorizations or not, and how we're dealing with that? And maybe, again, drilling down on some of the discussions on where the coverage actually stands in terms of covered lives, if you can give us any sense. . . .

[Went:] Let me deal first with the managed care side of things, Ken. The - I think people do traditionally think very much of coverage or not coverage. And that's a black-and-white situation. What I think is really important to realize is that black-andwhite situation, we're not experiencing that black-and-white situation. We do have formal coverage. I'm going to define formal coverage for you here as a situation in which plans have made a decision, a public decision as to how they will handle GOCOVRI and manage approval of GOCOVRI prescriptions, when presented. That's – we'll call that coverage for the sake of argument. And there are good number of plans that have actually made that decision and presented those conclusions publicly and then at handling the GOCOVRI prescriptions according to that pathway. ***But we are seeing, across all of the payers that we've addressed and dealt with, responsiveness, regardless of whether they have published set of criteria or not to manage GOCOVRI. And yes, in some cases, that results in the prior authorization request, which then leads to, ultimately, prescription fulfillment. But we're seeing prescription fulfillment across most every plan. There's very few that are not fulfilling. We have a handful of filed decisions where people are not fulfilling prescriptions. But in general, people are all fulfilling, whether they have a published plan or not.***

(Emphasis added.)

### April 26, 2018 Proxy Statement

99.     On April 26, 2018, the 2018 Proxy Statement. Defendants Went, Bigham, Demski, Dier, Ericson, Lieberburg, Mahoney, and MacPhee solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

100.     With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated, "[w]e have adopted a code of business conduct and ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting."

101.     The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

102.     The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) health insurers and other payors were by and large providing limited or no coverage of GOCOVRI, or were imposing

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

burdensome requirements that limited patients' access to GOCOVRI; (2) as payors began to indicate their positions on GOCOVRI, the number of physicians prescribing GOCOVRI would decrease precipitously; (3) as a result of the foregoing, GOCOVRI's sales, market penetration, and market share would be severely impacted in the long run; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

*May 3, 2018 Conference Call*

103.    On May 3, 2018, the Company held a conference call to discuss the Company's financial results for the fiscal quarter ended March 31, 2018. During the call, Defendant King attempted to downplay the effect of prior authorization on support for GOCOVRI, stating the following:

> ***Today we've seen support from payers regarding GOCOVRI prescription reimbursement, a process which is handled by our GOCOVRI onboard program. The significant majority of prescriptions submitted are being reimbursed with less than 2% of prescriptions received to-date ultimately rejected as not covered.***
>
> While specific criteria for coverage may not yet be available and/or may differ slightly from plan to plan in the majority of cases and across all peer segments, coverage is supported if the patient has a diagnosis of Parkinson's disease dyskinesia is consistent with labeling. ***Some plans also ask the physician to confirm that the patient has a medical history with amantadine IR.***

(Emphasis added.)

104.    Also during the call, the following exchange took place between Defendant King and Piper Jaffray analyst David Ansellem:

> [Amsellem:] Can I ask you similar [sic] related question it may be a bit of a backward looking question but are you surprised regarding the extent to which you are seeing patient having to be step [sic] through immediate release amantadine. And I guess maybe another way of asking this is, as you look to broaden the patient audience and presumably get access to patients who are naïve to amantadine. Does that inform in any way your willingness to contract more aggressively?
>
> [King:] So, let me just try and pickup on the first point you mentioned stepping through IR you mentioned, ***I'm not aware of any plan that has a hard step for us through IR amantadine. I am aware of plans that have – I'm interested as to whether IR amantadine has been tried before in patients and has been shown to be ineffective or not well-tolerated, we've seen that. But I'm unaware of any plan which is a formal step through IR amantadine.***

(Emphasis added.)

### August 2, 2018 Conference Call

105.    On August 2, 2018, the Company held a conference call to discuss the Company's financial results for the fiscal quarter ended March 31, 2018. During the call, the following exchange took place between Defendant King and Evercore ISI analyst Josh Schimmer:

> [Schimmer:] Since the last update, it looks like the number of prescribers of GOCOVRI have grown by about 75%. The scrips per prescribers have grown by about 20%. So how do you think about those drivers going forward, the ability to sustain kind of 30 new prescribers per week? And I think some of your commentary suggested that maybe the growth in prescriptions per prescriber may be slowing just based on the delay in getting physicians to hear back from patients. So how effective do you think your efforts will be in at least sustaining this pace of growth of prescriptions per prescriber?
>
> * * *
>
> [King:] Certainly. So Josh, the number of prescribers, getting to 1,000 prescribers within 6 months, I feel, is a significant success. And you're right, that you could do the -- the math is about 30 or so per week. Inevitably, that's going to slow down. It has to at some stage. But certainly, I don't imagine that's going to stop. It will just slow down gradually over the course of time. In terms of the prescriptions per prescriber, it has increased. ***But the important thing, as I mentioned on the call, we still see a number of physicians who are in a trial mode for GOCOVRI. We do think that, that largely reflects, that when we present the GOCOVRI data to them, they're surprised by the dramatic affects that GOCOVRI has on dyskinesia and OFF and ON functional time, particularly in comparison to immediate release amantadine. And because of this, they decide that they want to prove to themselves, in their own hands, that the clinical benefits that we describe for GOCOVRI are as strong as our Phase III data illustrates. And for that reason, they trial the product. And the good news is that the feedback from patients is strong and generally complementary of the effects that we see in Phase III. And then as physicians move through that trial period, they become regular and continuous prescribers of GOCOVRI at that stage. It's our challenge to get them through that trial period as quickly as possible.*** And that's our focus for the second half of the year.

(Emphasis added.)

106.    Also during the call, the following exchange took place between Defendant King and William Blair analyst Myles Minter:

> Minter:] Myles Minter on for Tim Lugo. My question is just about more granularity, about the time lag that you see with patients that aren't following up as quickly as you'd like. How long does it take from going away from the doc with a scrip to potentially seeing them coming back?

[King:] So I'll take that one. *It's variable. But we know that the standard cycle of a patient seeing a physician is a 3-month cycle. So we would also like to see that accelerated and get feedback to the physician faster than that 3-month cycle.*

(Emphasis added.)

107.    In response to an analyst question regarding patient access to GOCOVRI, Defendant Went stated the following:

And with regard to -- just back to Greg. With patients not paying, Ken, we're not -- as Alf commented in his part of the call, *the Quick Start, which was used in the beginning, is being used less and less, as patients become familiar and begin to put multiple patients onboard, and gain more confidence in GOCOVRI Onboard. And the percentage who are being supported by our patient assistance program is also very small.*

(Emphasis added.)

108.    Also during the call, the following exchange took place between Defendant Merriweather and Josh Schimmer:

[Schimmer:] Great. And then last question, maybe you could just discuss the status of reimbursement, characterize the ease of access to GOCOVRI, percent of plans with prior auths and as well what you're seeing from IR or sustained IR amantadine versions in terms of their positioning on formularies as well.

[Merriweather:] So very little on sustained IR. I like that characterization actually. *In terms of our position on formularies, we continue to see current plans that have issued now formal guidance on how to process reimbursement for GOCOVRI. That continues to happen. There are still a number of plans that have not published those formal criteria yet. But in the overwhelming majority of cases, we're seeing the vast majority of plans give us good support for reimbursement for GOCOVRI approval for reimbursement. And they're processing the prescription very, very quickly, which is clinging* [sic] *to us.*

(Emphasis added.)

109.    The statements in ¶¶ 90–98 and 103–108 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) health insurers and other payors were by and large providing limited or no coverage of GOCOVRI, or were imposing burdensome requirements that limited patients' access to GOCOVRI; (2) as payors began to indicate their positions on GOCOVRI, the number of physicians prescribing GOCOVRI would decrease

precipitously; (3) as a result of the foregoing, GOCOVRI's sales, market penetration, and market share would be severely impacted in the long run; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Gradually Emerges as False and Misleading Statements Continue

*October 5, 2018 Bank of America/Merrill Lynch Survey*

110.    On October 5, 2018, Bank of America/Merrill Lynch analyst Tazeen Ahmad downgraded the Company from "Buy" to "Neutral,"  and released a report showing higher than expected dropout rates for GOCOVRI among patients, in light of the drug's high cost, difficulties in securing prior authorizations, and the threat of a soon-to-be released competitor drug, OSMOLEX. The report stated the following, in relevant part:

> We conducted doctor checks with active prescribers who treat a total ~l.5k pts with Parkinson's disease (PD), of which ~700 are on generic amantadine IR and ~140 are on Gocovri. While this is a subset of total applicable physicians, their views are consistent with previous checks we have conducted this year. While respondents recognize the benefits of Gocovri over generic in reducing "off" time, better tolerability and lower pill burden (QD vs 3x a day), they note the hurdles to get patients on Gocovri due to cost (WAC [Wholesale Acquisition Cost]: $28.5k vs 2k for IR). ***The majority cited the need for prior authorization requests, with half noting requirement for prior treatment of generic.*** Doctors expect a moderate increase in Gocovri use in the next six months . . . . Gocovri is restricted on several formularies in 2019 (Express Scripts, CVS, United, Optum) but we note management in the past has stated to us that this is not in their view a deterrent to uptake.

(Emphasis added.)

111.    On this news, the price of the Company's stock fell from $19.35 per share at the close of trading on October 4, 2018, to $17.83 per share at the close of trading on October 5, 2018.

*November 1, 2018 Earnings Release and Conference Call*

112.    After the close of trading on November 1, 2018, the Company released its earnings results for the fiscal quarter ended September 30, 2018. The Company revealed disappointing results, disclosing that the Company expected only 2% market penetration by the end of 2019, up from 1% market penetration by the end of 2018.

113.   Also on November 1, 2018, the Company held a conference call to discuss the Company's financial results for the fiscal quarter ended September 30, 2018. During the call, Defendant Went stated, "We continue to believe that GOCOVRI is an extremely important drug and that we can reach 25% to 30% peak penetration in the Parkinson's disease dyskinesia population."

114.   In response to an analyst questioning the impact of OSMOLEX on the Company's prospects, Defendant Went stated the following:

> Thanks for the question. We don't really expect any change in the formulary coverage. ***As you know, we're not a formally covered, but we are reimbursed and the majority of prescriptions are we*** [sic] ***getting reimbursed in a really good period of time.*** We have heard a bit about OSMOLEX coming to the market. That product has a very different value proposition being once daily in the morning equivalent version of amantadine IR. I think it will be – and it has a separate indication, it is supported only by pharmacokinetic data and not by any efficacy data since as you recall the original label for Symmetrel does not contain a significant data package to promote to. ***And so I think it will be largely independent from us in terms of how it ends up being reimbursed and what its challenges will be and whether or not it gets folded into something that physicians are encouraged to try as some plans have done with amantadine IR, I think remains to be seen. But again, we are – we've been facing that market reality since, well before we launched the product and are pleased with how that is playing out right now in terms of any kind of a prior attestation of use of amantadine IR.***

(Emphasis added.)

115.   In response to an analyst commenting on patient access to GOCOVRI, Defendant Merriweather stated the following:

> Yes, Ken. We're not wanted to get into sort of the specifics of NRx levels and so on. But what we're trying to convey was that internal term, we use generally consistent. So, really, we're saying that we're in that very same range quarter-to-quarter. That was the tone that we were trying to get a general sense that you're trying to convey. ***With regard to the question was sort of free drug, I think that was the gist of your question. And we continue to see a minority of prescriptions, patients coming through the Quick Start program. So, it's there as part of our armor if you like, but not necessarily, a significant element. It's not trivial, but it's certainly not significant.***

(Emphasis added.)

116.   Also during the call, the following exchange took place between Defendant Went and Evercore ISI analyst Josh Schimmer:

[Schimmer:] One more question if I may, it looks like in the third quarter, you've now switched to growth driven, much more extensively by scripts per prescriber as opposed to the incremental number of prescribers, which seems to be slowing a little bit. Maybe as you look at the trends throughout the quarter, you can give us a sense of what you expect going forward as the primary driver. And whether this – either of these growth trajectories are at some kind of a steady state?

[Went:] Josh, it's Greg, let me take that on. What we're seeing in my remarks on the call, it really kind of reflects the sort of specialty, subspecialty nature of this market. ***We're getting very, very strong adoption in the movement disorders we've become adopted in with a greater 5% penetrance in that percentage, which means a relatively high volume prescription there. And then if you look back all the way down to the general neurologist, it's still in a smaller population and in more of a trialing phase. So with the efforts we're going to take during the quarter and in next quarter, it really is about aligning sales execution and incentives into those movement disorder centers, the simplification of the messaging and then the educating on the breadth of patients present there and your other message, which was how to properly dose them, we think is what's going to drive the business forward. And what that's going to lead to is, we believe greater penetrance in these very large centers and where we have neurologists, who have eligible patients. It's a smaller practice and we look forward to seeing that occur as well. But clearly for the next several quarters, the focus is on the larger centers and deepening the prescribing behavior per physician.***

(Emphasis added.)

117.    On this news, the price of the Company's stock fell from $16.97 per share at the close of trading on November 1, 2018, to $11.89 per share at the close of trading on November 2, 2018, a drop of almost 30%.

**March 4, 2019 Conference Call**

118.    On March 4, 2019, the Company held a conference call to discuss the Company's financial results for the fiscal quarter and full year ended December 31, 2018. During the call, Defendants Went and Merriweather reduced previous growth expectations for the Company and declined to offer further guidance for 2019, stating the following:

[Went:] We believe that advancing prescriber education and positive experience of GOCOVRI through these and our other commercial efforts will drive the use of GOCOVRI going forward. We are excited about the potential of these approached which are live in the field today. Of course, we are still relatively early in our launch, actively learning, and we expect it to take a few quarters for these improved execution efforts to take effect. During this time, our results may continue to fluctuate quarter-to-quarter. ***As we look back on the latter part of 2018, we specifically note a slowing in the rate of total prescription growth quarter-to-quarter, which we see continuing into the first part of 2019.*** While seasonal phenomenon maybe playing some role in this, ***we are focused***

*on the improved execution previously mentioned in order to expand GOCOVRI use and adoption in 2019 and beyond.*

* * *

[Merriweather:] Let me know [sic] turn to our outlook for 2019. We expect continued total prescription and revenue growth for the year based upon the benefits of GOCOVRI and the commercial initiatives to drive demand that Greg noted. ***Because we're still very early in the commercialization of GOCOVRI, we're not providing prescription or revenue guidance in 2019.***

(Emphasis added.)

119.    Went also stated the following with respect to the accessibility of GOCOVRI:

***[W]e have evolved our Quick Start program into a broader free trial program to allow more prescribers and patients to readily experience firsthand the benefits of GOCOVRI.*** This option will also potentially encourage trial of GOCOVRI in a broader array of patient [sic] with dyskinesia consistent with the population in which GOCOVRI was studied.

(Emphasis added.). In response to analyst David Amsellem's prompting to provide clarification on what guideposts analysts could look to in order to understand the trajectory of GOCOVRI in the wake of the Company's backtracking from its prior guidance, Defendant Went stated:

[Went:] David, thanks for your question. Listen, as we started with the third quarter call and reiterated today, our goal right now is to drive growth in TRx through the strategies I just described. We then implemented a number of these in the last few weeks at our National Sales Meeting, as we came off the call and really spend the fourth quarter developing the materials and the newer tools that we have rolled out to the field. So they are now all live in the field.

***As we look back from the end of last year, as I mentioned on the call, we did see a slower rate of increase in the TRx, and given that trend in the end of the fourth quarter and going into the first quarter, are not going provide [sic] any specific TRx guidance this year, or revenue guidance.*** So, we will continue to drive that growth through spreading the GOCOVRI message, broadening the GOCOVRI message around, and it's typical early -- still in launch,

120.    During the call, the following exchange took place between William Blair analyst Tim Lugo and Defendant Went regarding GOCOVRI sales growth:

[Lugo:] …. And sequentially should we be expecting growth throughout the year in GOCOVRI in terms of just net product sales?

[Went:] Tim, what we think the current trajectory, which is, it's just very difficult to model as you know, four quarters into a launch. We are pleased with where it is overall. ***The strategies we are implying right now are specifically intended to drive TRx and adoption into the areas where we are seeing lesser performance.*** We are very enthused by what we are seeing in some really core areas as adoption has occurred both broadly and deeply, but we still need to make progress, and we believe the tactics we are laying out are going to allow us to grow. And we will be monitoring it and reporting it to you very carefully as the next couple of quarters proceed.

(Emphasis added.)

121.    Also    during    the    call,    the    following    exchange    took    place    between    Bank    of America/Merrill Lynch analyst Tazeen Ahman and Defendant Went regarding the Company's guidance:

[Ahmad:] Okay. And then wanted to get your thoughts also on how you're thinking about the overall ramp. So if you're not giving guidance on specific numbers on script gross, where do you think you can guide us to where the growth could be? Is the growth going to come from doctors that have already been prescribing it or are you looking more to growth from new prescribers?

[Went:] Great question that kind of ties into Ken's. Where we're seeing adoption that we're pleased with in those areas, what we're seeing is both a breadth of adoption in an area, as well as a dept of adoption, and physicians are continuing to prescribe GOCOVRI and we see them deepening that as is common in the launch of a new product. ***Where we need to be successful with the efforts that we're laying out that we've just introduced to the field in the last couple of weeks is in areas where the adoption is not as deep, where the number of experiences the physicians have had are not as significant as I'd like to be.*** And we believe from what we've seen that the market is every bit as big as we thought it was, based upon how the top areas are performing, but ***in those areas where we're not seeing that performance, we really need to get, you know, if you will, the fire started, get that deepening beginning, so that physicians and then neighboring physicians can see the impact that GOCOVRI can have both on their reduction in dyskinesia, but their ability to manage these patients more effectively through the improvements and reduction and OFF time as well.***

(Emphasis added.)

122.    Lastly, Defendant Went stated the following regarding GOCOVRI usage:

***We see as a proof point, our learning from 2018 that we needed to better educate prescribers about the appropriate use of GOCOVRI and the availability of the 68.5 milligram starting dose for patients with moderate to severe renal impairment. Many PD patients are elderly and less [thus?] more likely to have renal impairment. Such patients not properly dosed on GOCOVRI could have, and in some cases, have had negative experiences on the medicine with the occurrence of adverse events.*** Accordingly, we armed our field team with specific messages around appropriate dosing,

and added the 68.5 milligram dose as a reduced dosing option on our treatment front. We are already seeing a positive impact of this approved education.

(Emphasis added.)

123.   Analysts reacted with consternation to these disclosures. For example, Piper Jaffray analyst David Amsellem reduced his price target for the Company, stating, " With Adamas refining its marketing message on GOCOVRI, in addition to starting a sampling program over one year following the launch, it is fair to wonder if management has misread both its physician audience and the payer landscape."

124.   Mizuho analyst Irina Koffler lowered her price target for the Company and downgraded the Company's rating to "Underperform," stating that GOCOVRI's launch was going "even worse than we thought."

125.   Cowen analyst Ken Cacciatore also lowered his price target for the Company and downgraded his rating of the Company from "Outperform" to "Perform," stating the following:

> Disclosure that Gocovri Rx trajectory is flattening and that growth for the next several quarters is expected to be erratic is concerning this early in the launch. Reflecting management's removal of their previous qualitative guidance – and therefore lowering the growth trajectory – our corresponding DCF declines to where a downgrade is warranted.

126.   Needham analyst Serge Belanger downgraded his rating of the Company to "Hold," stating, "[w]e are heading to the sidelines, downgrading ADMS to a Hold, until we have better visibility that issues can be addressed and Gocovri's launch ramp can re-accelerate."

127.   Bank of America/Merrill Lynch analyst Tazeen Ahmad issued a report addressing the Company's March 5, 2019 disclosures, which stated the following, in relevant part:

> **[T]he expansion of free drug to 28 day (prev. 14-day) in our view is a signal of weak demand consistent with our prior doctor checks which led to our initial round of estimate revisions last fall. Recall, doctors we surveyed reported higher than-expected dropouts with only early signs of appreciation of its time release biology.** We continue to view Gocovri sales cautiously as: (i) competitor Osmotica recently initiated full commercial launch of Osmolex (also extended release amantadine) which is priced approx. 3x lower than Gocovri ($2.6K vs ~$1K/mo); (ii) **coverage remains scarce with several national formularies excluding Gocovri in 2019**; and (iii) ongoing litigations against Sandoz and Osmotica. In our model, we update 4Q financials including cash and share count.

We lower our peak penetration to 15% (prev. 18.5%) and adjust ramp rate in LID. We also adjust sales ramp for the follow-on indication in MS given struggling sales in lead indication and concerns on whether mgmt will be able to execute commercially. We now model Gocovri peak sales of $208mn (prev. $258mn) in LID (contributing $1/sh in our PO) in 2025. ADMS is expected to report topline results from ongoing ph 3 ADS-4101 study in multiple sclerosis walking impairment (MSWI) in 2H19. We reiterate our Neutral rating on ADMS shares with lower PO $10 (prev. $17), but note failure of the MS indication to advance would lead to meaningful downside to our current estimates.

(Emphasis added.)

128.    On this news, the price of the Company's stock fell from $12.15 per share at the close of trading on March 4, 2019, to $8.16 per share at the close of trading on March 5, 2019, a drop of over 32%.

129.    Negative reports continued to ensue, as the Company began shifting away from its prior commercial plans for GOCOVRI.

130.    On March 10, 2019, Mizuho analyst Irena Koffler issued a negative report on the Company, stating, "[w]e reiterate our Underperform rating and $5 PT after disappointing sequential trends for Gocovri, a topline miss, and delay of a pipeline program."

131.    On March 11, 2019, Seeking Alpha posted on article commenting on analysts' reactions and interactions with Company management during the March 5, 2019 conference call.[2] The article stated the following, in relevant part:

[T]he selling in afterhours coincided with the analyst Q&A session during the company conference call. ***Analysts appeared to be confused with the company's new changes in their commercial plan for GOCOVRI and the company's lack of revenue guidance for 2019. It seemed as if every analyst was asking for some clarification on these issues, but the Adamas management answered with vague responses. The management's opposition to offering specifics appeared to frustrate the analysts…*** I started to imagine the analyst downgrades in retaliation to the management's stonewalling.

The numbers did provide me confidence that GOCOVRI is making headway, but the vibe from the management had me wondering if they are preparing for a lackluster 2019. ***It was only a couple of months ago that the company's goal was to double its market penetration with GOCOVRI. Now… no targets, benchmarks, or specifics.***

---

[2]   https://seekingalpha.com/article/4247769-adamas-beats-on-earnings-misses-on-conference-call   (last visited February 25, 2020).

(Emphasis added.)

### April 25, 2019 Proxy Statement

132.    On April 25, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants Went, Bigham, Demski, Dier, Ericson, Lieberburg, Mahoney, and MacPhee solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

133.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[w]e have adopted a code of business conduct and ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting."

134.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

135.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) health insurers and other payors were by and large providing limited or no coverage of GOCOVRI, or were imposing burdensome requirements that limited patients' access to GOCOVRI; (2) as payors began to indicate their positions on GOCOVRI, the number of physicians prescribing GOCOVRI would decrease precipitously; (3) as a result of the foregoing, GOCOVRI's sales, market penetration, and market share would be severely impacted in the long run; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### Subsequent Analyst Reports

136.    Over the course of the next several quarters, the Company shifted its focus to prioritize obtaining FDA approval for GOCOVRI to be used as a treatment for a form of multiple sclerosis

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

("MS"). During a conference call held on May 9, 2019, for instance, Defendant Went stated that Adamas had "2 immediate priorities: GOCOVRI's launch in Parkinson's and the MS program." However, this shift did little to assuage negative analyst sentiments regarding the Company and its prospects.

137.    On May 27, 2019, Seeking Alpha posted another article commenting on the Company's performance, which stated the following:[4]

> What's My Verdict? Adamas was Overrated… I have to confess, I feel as if I continued to buy into the hype after GOCOVRI approval. I felt as if the company had a product that was destined to be prescribed to a large number of PD patients that were starved for a drug like GOCOVRI. ***Throw in street analysts projecting $75 per share and I feel a bit hoodwinked as ADMS investor. The company has not been able to grab a large piece of their market and hasn't done a great job admitting their initial outlook was too optimistic for a patient population that has so many challenges. So, I would say ADMS was overrated for the past year and change.***

(Emphasis added.)

138.    On September 27, 2019, the Evaluate Group published a report commenting on a preliminary study involving the use of GOCOVRI to treat MS. The report stated the following:

> Gocovri could find it tough to gain market share. Adamas's initial focus will be patients who have discontinued [competitor drug] Ampyra; around half of the patients in Inroads are Ampyra failures. But in order to sell really well, Gocovri will need to show markedly better efficacy than Ampyra. In one of its pivotal trials, the Acorda drug improved walking speed by 14% versus 8% with placebo at nine weeks.
>
> ***The omens are not good***: phase II data with Gocovri show a similar 17% improvement in walking speed at four weeks, although the usual caveats about crosstrial comparisons apply.

(Emphasis added.)

139.    At last, on September 30, 2019, Bank of America/Merrill Lynch analyst Tazeen Ahmad published another report on the Company, and further downgraded his rating of the Company to "Underperform." The report stated the following, in relevant part:

---

[4]    https://seekingalpha.com/article/4266659-adamas-pharmaceuticals-was-overrated    (last    visited February 25, 2020).

We lower our rating for ADMS shares to Underperform with new PO of $5 (from $9). We make our changes based on our recent doctor checks ahead of ph 3 INROADS data in MSWI (see page 3). Key points: (1) While efficacy data of '5102 in ph 2 is in line with current SoC (Ampyra), doctors are more confident about the safety profile of Ampyra (despite incidence of seizures as a concern) compared to '5102. Doctors continue to expect Ampyra as an earlier line tx especially with cheaper generic Ampyra available; (2) although doctors already use amantadine primarily for fatigue, its use in MSWI is of novel idea for doctors and will need time to gain comfort;…

We note existing overhangs for ADMS: (1) *Gocovri coverage: a number of national formularies exclude Gocovri. We expect reimbursement hurdles in MSWI space especially with generic Ampyra launch*; (2) ongoing litigations against Sandoz and Osmotica; (3) Osmolex launch: (priced approx. 3x lower than Gocovri) poses competitive risk; and (4) New mgmt team: ADMS will have a new CEO, CFO and CCO, to take over the launch in LID and oversee the pipeline. While we agree change in this situation can be good, we also note new CEO Neil McFarlane and CCO Vijay Shreedhar have prev. success, though they will also be on learning curves for the time being. A successful new indication or acceleration of LID sales would lead to upside in our ests.

(Emphasis added.)

140.    On the issuance of these reports, the price of the Company's stock fell once more, from $7.05 per share at the close of trading on September 26, 2019, to $4.03 at the close of trading on October 3, 2019, representing a six-day drop of over 42%.

## DAMAGES TO ADAMAS

141.    As a direct and proximate result of the Individual Defendants' conduct, Adamas has lost and expended, and will lose and expend, many millions of dollars.

142.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and its former CEO and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

143.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

144.    As a direct and proximate result of the Individual Defendants' conduct, Adamas has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will

plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

145.    Plaintiff brings this action derivatively and for the benefit of Adamas to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Adamas, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

146.    Adamas is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

147.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Adamas. Plaintiff will adequately and fairly represent the interests of Adamas in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

148.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

149.    A pre-suit demand on the Board of Adamas is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Bigham, Demski, Dier, Ericson, Lieberburg, Mahoney, and MacPhee (the "Director-Defendants"), along with non-party Neil F. McFarlane (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was commenced.

150.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

151.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or allowing certain of the Individual Defendants to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

152.    Additional reasons that demand on Defendant Bigham is futile follow. Defendant Bigham has served as a Company director since September 2006. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Bigham has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Bigham breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant Demski is futile follow. Defendant Demski has served as a Company director since March 2014. She also serves as the Chair of the Audit Committee, and as a member of the Compensation Committee. Defendant Demski has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Demski breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

154.     Additional reasons that demand on Defendant Dier is futile follow. Defendant Dier has served as a Company director since October 2017. She also serves as a member of the Audit Committee. Defendant Dier has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Dier breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

155.     Additional reasons that demand on Defendant Ericson is futile follow. Defendant Ericson has served as a Company director since 2005. He also serves as the Chair of the Nominating and Corporate Governance Committee, and as a member of the Compensation Committee. Defendant Ericson has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Ericson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.     Additional reasons that demand on Defendant Lieberburg is futile follow. Defendant Lieberburg has served as a Company director since 2004. Defendant Lieberburg has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Lieberburg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.    Additional reasons that demand on Defendant Mahoney is futile follow. Defendant Mahoney has served as a Company director since 2009, and as the Chairman of the Board since September 11, 2019. He also serves as the Chair of the Compensation Committee. Defendant Mahoney has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Mahoney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant MacPhee is futile follow. Defendant MacPhee has served as a Company director since 2004. Defendant MacPhee has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant MacPhee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand on the Board is futile follow.

160.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

161.    Defendants Bigham, Demski, and Dier (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the

Company's accounting and financial reporting processes, the integrity of the Company's financial statements and reports, the adequacy of the Company's disclosure controls and procedures, and the adequacy of the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

162.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. Moreover, in violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, or conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

163.    Adamas has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Adamas any part of the damages Adamas suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

164.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and

disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

165.    The acts complained of herein constitute violations of fiduciary duties owed by Adamas' officers and directors, and these acts are incapable of ratification.

166.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Adamas. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Adamas, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

167.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Adamas to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

168.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of**
### **Section 14(a) of the Securities Exchange Act of 1934**

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.    The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

171.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

172.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

173.    Under the direction and watch of the Directors, the 2018 and 2019 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) health insurers and other payors were by and large providing limited or no coverage of GOCOVRI, or were imposing burdensome requirements that limited patients' access to GOCOVRI; (2) as payors began to indicate their positions on GOCOVRI, the number of physicians prescribing GOCOVRI would decrease precipitously; (3) as a result of the foregoing, GOCOVRI's sales, market penetration, and market share would be severely impacted in the long run; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

174.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

175.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including election of directors and appointment of an independent auditor.

176.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Went, Bigham, Demski, Dier, Ericson, Lieberburg, Mahoney, and MacPhee, which allowed them to continue breaching their fiduciary duties to Adamas.

177.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

178.    Plaintiff on behalf of Adamas has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

179.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Adamas' business and affairs.

181.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

182.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Adamas.

183.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

184.   In further breach of their fiduciary duties owed to Adamas, the Individual Defendants willfully or recklessly made and/or allowed certain of the Individual Defendants and the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) health insurers and other payors were by and large providing limited or no coverage of GOCOVRI, or were imposing burdensome requirements that limited patients' access to GOCOVRI; (2) as payors began to indicate their positions on GOCOVRI, the number of physicians prescribing GOCOVRI would decrease precipitously; (3) as a result of the foregoing, GOCOVRI's sales, market penetration, and market share would be severely impacted in the long run; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

185.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

186.   In breach of their fiduciary duties, two of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

187.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

188.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

189.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

190.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Adamas has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

191.   Plaintiff on behalf of Adamas has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

192.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Adamas.

194.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Adamas that

was tied to the performance or artificially inflated valuation of Adamas, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

195.   Plaintiff, as a shareholder and a representative of Adamas, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

196.   Plaintiff on behalf of Adamas has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

197.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

199.   Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

200.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

201.   Plaintiff on behalf of Adamas has no adequate remedy at law.

## PRAYER FOR RELIEF

202.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Adamas, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted

the breach of their fiduciary duties to Adamas;

   (c) Determining and awarding to Adamas the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

   (d) Directing Adamas and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Adamas and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

    1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    2. a provision to permit the shareholders of Adamas to nominate at least four candidates for election to the Board; and

    3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

   (e) Awarding Adamas restitution from the Individual Defendants, and each of them;

   (f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

   (g) Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 16, 2020

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Patrick Van Camp   am a plaintiff in the within action.   I have reviewed the allegations made in this consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____ 3/13/2020 , 2020.

Patrick Van Camp

Patrick Van Camp